AO 93C (08/18) Warrant by Telephone or Other Reliable Electronic Means

❏ Original    ❏ **CLERK'S OFFICE**



A TRUE COPY

Mar 13, 2026

s/ JDH

**Deputy Clerk, U.S. District Court**
**Eastern District of Wisconsin**

# UNITED STATES DISTRICT COURT
for the

Eastern ~~District of~~ District of Wisconsin

|  |  |
|---|---|
| In the Matter of the Search of | ) |
| *(Briefly describe the property to be searched or identify the person by name and address)* | ) ) Case No.   **26-M-332 (SCD)** |
| Search of two cell phones belonging to Shelby Morris | ) ) ) ) |

## WARRANT BY TELEPHONE OR OTHER RELIABLE ELECTRONIC MEANS

To:      Any authorized law enforcement officer

An application by a federal law enforcement officer or an attorney for the government requests the search and seizure of the following person or property located in the _____Eastern_____ District of _____Wisconsin_____ *(identify the person or describe the property to be searched and give its location)*:

See Attachment A.

I find that the affidavit(s), or any recorded testimony, establish probable cause to search and seize the person or property described above, and that such search will reveal *(identify the person or describe the property to be seized)*:

See Attachment B.

**YOU ARE COMMANDED** to execute this warrant on or before _____3-27-26_____ *(not to exceed 14 days)*
❏ in the daytime 6:00 a.m. to 10:00 p.m.      ☑ at any time in the day or night because good cause has been established.

Unless delayed notice is authorized below, you must give a copy of the warrant and a receipt for the property taken to the person from whom, or from whose premises, the property was taken, or leave the copy and receipt at the place where the property was taken.

The officer executing this warrant, or an officer present during the execution of the warrant, must prepare an inventory as required by law and promptly return this warrant and inventory to _____Stephen C. Dries, U.S. Magistrate Judge_____.
*(United States Magistrate Judge)*

❏ Pursuant to 18 U.S.C. § 3103a(b), I find that immediate notification may have an adverse result listed in 18 U.S.C. § 2705 (except for delay of trial), and authorize the officer executing this warrant to delay notice to the person who, or whose property, will be searched or seized *(check the appropriate box)*
❏ for _____ days *(not to exceed 30)*   ❏ until, the facts justifying, the later specific date of _____.

Date and time issued:      3-13-26. 12:50 pm           *(signature)* Stephen C. Dri
                                                                          *Judge's signature*

City and state:   Milwaukee, Wisconsin          Stephen C. Dries, U.S. Magistrate Judge
                                                                  *Printed name and title*

| **Return** | | |
|---|---|---|
| Case No.: | Date and time warrant executed: | Copy of warrant and inventory left with: |

Inventory made in the presence of :

Inventory of the property taken and name(s) of any person(s) seized:

**Certification**

I declare under penalty of perjury that this inventory is correct and was returned along with the original warrant to the designated judge.

Date: _____

_____
*Executing officer's signature*

_____
*Printed name and title*

**ATTACHMENT A**

The property to be searched are the following electronic devices ("TARGET DEVICES"):

a. An Apple iPhone 6s in a black-and-silver case, Model # N71mAP with IMEI 355686073553064 ("TARGET DEVICE A"), inventoried as Racine Police Department, Incident Report Number 24-021599, Item 28, and the copy of the previously extracted electronically stored data from TARGET DEVICE A extracted on or about June 4, 2024.

b. A gray touchscreen "Wiko" brand cell phone, Model #U616AT with IMEI 860325064718265 ("TARGET DEVICE B"), inventoried as Racine Police Department, Incident Report Number 24-021599, Item 29, and the copy of the previously extracted electronically stored data from TARGET DEVICE B extracted on or about June 3, 2024.

The TARGET DEVICES, and copies of the previously extracted electronically stored data from the TARGET DEVICES, are currently in possession of the City of Racine Police Department, 730 Center Street, Racine, Wisconsin 53403.

This warrant authorizes the forensic examination of the TARGET DEVICES for the purpose of identifying the electronically stored information, and for the review of the previously extracted electronically stored information from the TARGET DEVICES, particularly described in Attachment B.

## ATTACHMENT B

1.      All records on the TARGET DEVICES described in Attachment A that relate to violations of 21 U.S.C. §§ 841(a)(1) and 843(b), and 18 U.S.C. §§ 922(g)(1), 924(a)(8), and 924(c)(1)(A), and involve Shelby Morris between on or about January 1, 2024 and May 30, 2024, including:

    a. Information about controlled substances, including tablets, powder, and vape cartridges;

    b. Information about paraphernalia associated with the manufacture and distribution of controlled substances, including scales, measuring devices, weighing devices, packaging materials, and containers, bags, or boxes to hold or transport controlled substances;

    c. Information about the proceeds of drug trafficking activities, such as currency, crypto currency (in any format, including but not limited to wallets (digital and paper), public keys (addresses), private keys, and recovery seeds), precious metals, financial instruments, jewelry, and documents and deeds reflecting the purchase or lease of real estate, vehicles, precious metals, jewelry, or other items obtained with the proceeds of drug trafficking activities;

    d. Bank account records, loan documents, wire transfer records, money order receipts, postal express mail envelopes, bank statements, safe deposit box keys and records, money containers, financial records and notes showing payment, receipt, concealment, transfer, or movement of money generated from the sale of controlled substances, or financial transactions related to the trafficking of controlled substances;

    e. Drug or money ledgers, drug distribution or customer lists, drug supplier lists, correspondence, notations, logs, receipts, journals, books, records, and other documents noting the price, quantity, or times when controlled substances were obtained, transferred, sold, distributed, or concealed;

    f. lists of customers and related identifying information;

    g. types, amounts, and prices of drugs trafficked as well as dates, places, and amounts of specific transactions;

    h. Personal telephone books, address books, telephone bills, photographs, letters, cables, telegrams, facsimiles, personal notes, documents and other items or lists reflecting names, addresses, telephone numbers, addresses and communications regarding illegal activities among and between members and associates involved in drug trafficking activities;

i.  Records of off-site storage locations, including but not limited to safe deposit box keys and records, and records and receipts and rental agreements for storage facilities;

j.  Records and information related to travel for purposes of drug trafficking, such as passports, airline tickets, bus tickets, vehicle rental receipts, credit card receipts, taxi cab receipts, hotel and restaurant receipts, canceled checks, maps, and records of long distance calls reflecting travel;

k.  Records relating to the possession, receipt, or transfer of any firearms and/or ammunition, including a Ruger firearm and a Taurus firearm;

l.  Information about possession in furtherance of a drug trafficking crime or crime of violence, and information during and in relation to a drug trafficking crime and carrying and using in relation to, or brandishing or discharge of a firearm;

m.  any information related to sources of drugs (including names, addresses, phone numbers, or any other identifying information);

n.  any information recording SHELBY MORRIS's schedule or travel from January 1, 2024 to May 30, 2024;

o.  Indicia of occupancy, residency, or ownership of the premises and things described in the warrant, including utility bills, telephone bills, loan payment receipts, rent receipts, trust deeds, lease or rental agreements, addressed envelopes, escrow documents, and keys;

p.  all bank records, checks, credit card bills, account information, and other financial records;

q.  Photographs, videotapes, or other records of assets, co-conspirators, or controlled substances;

r.  Records and information relating to a conspiracy to distribute, manufacture, dispense, or possess with the intent to manufacture, distribute, or dispense a controlled substance;

s.  Records and information relating to the distribution, manufacture, dispensing, or possession with the intent to manufacture, distribute, or dispense a controlled substance;

t.  Records and information about customers, including lists of customers and related identifying information;

u.  Records and information relating to the types, amounts, and prices of drugs imported, trafficked, and distributed as well as dates, places, and amounts of specific transactions;

2

v. Records and information relating to sources of drugs (including names, addresses, phone numbers, or any other identifying information);

w. evidence of who used, owned, or controlled the TARGET DEVICES at the time the things described in this warrant were created, edited, or deleted, such as logs, registry entries, configuration files, saved usernames and passwords, documents, browsing history, user profiles, email, email contacts, "chat," instant messaging logs, photographs, and correspondence;

x. evidence of software that would allow others to control the TARGET DEVICES, such as viruses, Trojan horses, and other forms of malicious software, as well as evidence of the presence or absence of security software designed to detect malicious software;

y. evidence of the lack of such malicious software;

z. evidence indicating how and when the computer was accessed or used to determine the chronological context of computer access, use, and events relating to crime under investigation and to the computer user;

aa. evidence indicating the computer user's state of mind as it relates to the crime under investigation;

bb. evidence of the attachment to the TARGET DEVICES of other storage devices or similar containers for electronic evidence;

cc. evidence of counter-forensic programs (and associated data) that are designed to eliminate data from the TARGET DEVICES;

dd. evidence of the times the TARGET DEVICES was used;

ee. passwords, encryption keys, and other access devices that may be necessary to access the TARGET DEVICES;

ff. documentation and manuals that may be necessary to access the TARGET DEVICES or to conduct a forensic examination of the TARGET DEVICES;

gg. records of or information about Internet Protocol addresses used by the TARGET DEVICES;

hh. records of or information about the TARGET DEVICES's Internet activity, including firewall logs, caches, browser history and cookies, "bookmarked" or "favorite" web pages, search terms that the user entered into any Internet search engine, and records of user-typed web addresses; and

ii. contextual information necessary to understand the evidence described in this attachment.

2. Evidence of user attribution showing who used or owned the TARGET DEVICES at the time the things described in this warrant were created, edited, or deleted, such as logs, phonebooks, saved usernames and passwords, documents, and browsing history.

As used above, the terms "records" and "information" include all of the foregoing items of evidence in whatever form and by whatever means they may have been created or stored, including any form of computer or electronic storage (such as flash memory or other media that can store data) and any photographic form.

This warrant authorizes a review of electronic storage media and electronically stored information seized or copied pursuant to this warrant in order to locate evidence, fruits, and instrumentalities described in this warrant. The review of this electronic data may be conducted by any government personnel assisting in the investigation, who may include, in addition to law enforcement officers and agents, attorneys for the government, attorney support staff, and technical experts. Pursuant to this warrant, the FBI may deliver a complete copy of the seized or copied electronic data to the custody and control of attorneys for the government and their support staff for their independent review.

4



CLERK'S OFFICE
A TRUE COPY
Mar 13, 2026
s/ JDH
Deputy Clerk, U.S. District Court
Eastern District of Wisconsin

# UNITED STATES DISTRICT COURT

for the

Eastern District of Wisconsin

In the Matter of the Search of

*(Briefly describe the property to be searched or identify the person by name and address)*

Search of two cell phones belonging to Shelby Morris

)
)
)
)
)
)

Case No. 26-M-332 (SCD)

## APPLICATION FOR A WARRANT BY TELEPHONE OR OTHER RELIABLE ELECTRONIC MEANS

I, a federal law enforcement officer or an attorney for the government, request a search warrant and state under penalty of perjury that I have reason to believe that on the following person or property *(identify the person or describe the property to be searched and give its location):*

See Attachment A.

located in the _____ **Eastern** _____ District of _____ **Wisconsin** _____ , there is now concealed *(identify the person or describe the property to be seized):*

See Attachment B.

The basis for the search under Fed. R. Crim. P. 41(c) is *(check one or more)*:

☑ evidence of a crime;

☐ contraband, fruits of crime, or other items illegally possessed;

☑ property designed for use, intended for use, or used in committing a crime;

☐ a person to be arrested or a person who is unlawfully restrained.

The search is related to a violation of:

| *Code Section* | *Offense Description* |
|---|---|
| 21 U.S.C. §§ 841(a)(1) and 843(b); 18 U.S.C. §§ 922(g)(1), 924(a)(8), and 924(c)(1)(A) | possession with intent to distribute a controlled substance, distribution of a controlled substance, manufacturing a controlled substance, use of a facility to facilitate a felony drug crime, prohibited possession of a firearm, and possession i |

The application is based on these facts:

See the attached affidavit.

☑ Continued on the attached sheet.

☐ Delayed notice of \_\_\_\_\_ days *(give exact ending date if more than 30 days:* _____ *)* is requested under 18 U.S.C. § 3103a, the basis of which is set forth on the attached sheet.

TFO *(signature)*

*Applicant's signature*

Kevin Klinkhammer, Task Force Officer (FBI)

*Printed name and title*

Attested to by the applicant in accordance with the requirements of Fed. R. Crim. P. 4.1 by

_____ telephone _____ *(specify reliable electronic means).*

Date: 3-13-26

*(signature)*

*Judge's signature*

City and state: Milwaukee, Wisconsin

Stephen C. Dries, U.S. Magistrate Judge

*Printed name and title*

## AFFIDAVIT IN SUPPORT OF AN APPLICATION UNDER RULE 41 FOR A WARRANT TO SEARCH AND SEIZE

I, Kevin R. Klinkhammer, being first duly sworn, hereby depose and state as follows:

## INTRODUCTION AND AGENT BACKGROUND

1. I make this affidavit in support of an application under Rule 41 of the Federal Rules of Criminal Procedure for a search warrant authorizing the examination of property—electronic devices—which are currently in law enforcement possession, and the extraction from that property of electronically stored information described in Attachment B.

2. I am a sworn law enforcement officer with the City of Racine Police Department and a Task Force Officer with the Federal Bureau of Investigation (FBI) assigned to the Milwaukee Area Safe Streets Task Force, with authority to investigate federal offenses including violations of Titles 18 and 21 of the United States Code.

3. I have been employed as a law enforcement officer with the City of Racine (Wisconsin) since March 2000 and a sworn Federal Task Force Officer with the FBI since 2008. I have obtained a Bachelor of Science Degree in Political Science with a Law Studies emphasis and a Minor in Criminal Justice from the University of Wisconsin - Milwaukee. I have been involved in the enforcement and investigation of numerous violations of federal and state law to include drug trafficking investigations, firearm trafficking investigations, and violent crime related cases. I have personally conducted and participated in numerous investigations that have given me familiarity with the various methods that criminals use to conduct illicit firearm and narcotics transactions in violation of federal law.

4. As part of my duties, I investigate criminal violations relating to drug trafficking and firearms, including violations of 21 U.S.C. §§ 841(a)(1), 843(b), and 846, and 18 U.S.C. §§ 922(g)(1), 924(a)(8), and 924(c)(1)(A)(i). I have participated in investigations that have led to

the issuance of search warrants involving violations of narcotics laws. These warrants involved the search of locations including the residences of targets, their associates, and relatives, stash houses, storage facilities, bank safe deposit boxes, cellular/camera phones, and computers. Evidence searched for and recovered in these locations has included controlled substances, records pertaining to the expenditures and profits realized therefrom, monetary instruments, and various assets that were purchased with the proceeds of drug trafficking. I have participated in the execution of multiple federal search warrants, including the review of electronic evidence from phones of drug traffickers.

5. Based on my training and experience, I know and have participated in the following:

a. I have functioned as both a case agent and co-case agent in numerous investigations into illegal drug distribution conspiracies.

b. I have interviewed witnesses, confidential human sources (CHS) and sources of information (SOI) relative to the illegal trafficking of drugs and the distribution of monies and assets derived from the illegal trafficking of drugs (laundering of monetary instruments).

c. I have utilized informants to investigate drug trafficking. Through informant interviews, and extensive debriefings of individuals involved in drug trafficking, I have learned about the manner in which individuals and organizations distribute controlled substances in Wisconsin and throughout the United States.

d. I have also relied upon informants to obtain controlled substances from dealers.

e. I have extensive experience conducting street surveillance of individuals engaged in drug trafficking. I have participated in the execution of numerous search warrants where controlled substances, drug paraphernalia, and drug trafficking records were seized.

f. I am familiar with the appearance and street names of various drugs, including marijuana, heroin, fentanyl, cocaine, cocaine base, ecstasy, and methamphetamine. I am familiar with the methods used by drug dealers to package and prepare controlled substances for sale. I know the street values of different quantities of the various controlled substances.

g. I am familiar with the language utilized over the telephone to discuss drug trafficking, and know that the language is often limited, guarded, and coded.

2

h. I know that drug traffickers often use electronic equipment and cellular telephones to conduct drug trafficking operations.

i. I know that drug traffickers commonly have in their possession, and at their residences and other locations where they exercise dominion and control, firearms, ammunition, and records or receipts pertaining to such.

j. I know that drug traffickers often put their telephones in nominee names to distance themselves from telephones that are utilized to facilitate drug trafficking.

k. I know that drug traffickers often use drug proceeds to purchase assets such as vehicles, property, and jewelry. I also know that drug traffickers often use nominees to purchase and/or title these assets to avoid scrutiny from law enforcement officials.

6. Based on my training and experience and information from other experienced drug investigators, I know that:

a. Drug traffickers commonly maintain books, papers, files, and other records which reflect the names, addresses, and/or telephone numbers of their suppliers, couriers, customers, and other associates in the illegal drug trade.

b. Drug traffickers maintain books, records, receipts, notes, ledgers, airline tickets, money orders, and other files relating to the purchase, packaging, sale, distribution, and transportation of their product.

c. Drug traffickers conceal in their residences and/or places of business the proceeds of their illegal activity, including large amounts of United States currency, financial instruments, precious metals, jewelry, rare coins, works of art, and other items of value, as well as books and records regarding the acquisition, use, and disposition of such items of value.

d. When drug traffickers amass large proceeds from the sale of controlled substances, they attempt to legitimize these profits, often accomplishing this goal by using the services of banks, other financial institutions, and real estate brokers, and maintain books and papers related to such efforts. It is common for drug traffickers to maintain the aforementioned books, papers, and documents in secure places within their residences and/or places of business so that the drug traffickers have ready access to such information.

e. Drug traffickers frequently take, or cause to be taken, photographs of themselves, their associates in the drug trade, property acquired from the distribution of drugs, and their product, and such photographs are often kept in their residences and/or places of business.

3

f. Drug traffickers often place assets, including real and personal property, such as vehicles, in names other than their own to avoid the detection and forfeiture of such assets by government agencies. Drug traffickers continue to use these assets and to exercise dominion and control over them even though the assets are nominally owned by others.

g. It is common practice for drug traffickers to conceal in their residences and/or places of business secure places to store the contraband including but not limited to safes and that once a sizeable load of contraband has been delivered, to repackage and break-down larger quantities of illegal drugs into smaller more easily handled and concealed quantities for distribution. Paraphernalia related to the packaging, cutting, weighing and distribution of contraband is usually secreted or stored in their residences and/or places of business

h. Drug traffickers frequently possess firearms and ammunition to protect their illegal product.

i. Drug traffickers frequently keep the aforementioned evidence set forth in their residences because, for example, drug traffickers keep detailed records of their activities close at hand as they receive calls from other members of the organization at all hours of the day and night and need access to those materials. Additionally, although some drug traffickers prefer to store contraband outside of their known places of residence, in my training and experience, they do not have the same concerns when it comes to items set forth in above because said items are not illegal to possess.

j. Drug traffickers frequently possess multiple cellular phones or other electronic devices to communicate with narcotics suppliers, associates, and customers, and to avoid detection by law enforcement.

k. During the course of such residential searches, I and other agents have also found items of personal property that tend to identify the person(s) in residence, occupancy, control, or ownership of the premises being searched. Such identification evidence is typical of the articles people commonly maintain in their residences, such as canceled mail, deeds, leases, rental agreements, photographs, personal telephone books, diaries, utility and telephone bills, statements, identification documents, and keys.

7. As part of my duties, I also investigate criminal violations relating to unlawfully possessed firearms, firearms trafficking, and possession of machineguns including criminal violations of firearms laws, including but not limited to 18 U.S.C. §§ 922(g)(1), 924(a)(8), and

4

924(c)(1)(A). Based on my training and experience, I know and have participated in the following:

   a. I have functioned as both a case agent and co-case agent in several investigations into illegal firearms and machinegun possession and firearms trafficking.

   b. I am familiar with the language utilized over the telephone to discuss illegal firearms and know that the language is often limited, guarded, and coded.

   c. I have utilized informants to investigate the sale and possession of illegal firearms, and I have also relied upon informants to obtain illegal firearms from dealers.

   d. I know that people engaged in illegal possession or distribution of firearms often use electronic equipment and cellular telephones to conduct firearm trafficking operations.

   e. I know that drug traffickers commonly have in their possession, and at their residences and other locations where they exercise dominion and control, firearms, ammunition, and records or receipts pertaining to such.

   f. I have interviewed or participated in interviews of witnesses, confidential human sources (CHS), and sources of information (SOI) relative to the illegal possession and distribution of firearms.

8. I have participated in numerous investigations involving the seizure of computers, cellular phones, cameras, and other digital storage devices, and the subsequent analysis of electronic data stored within these devices. I have also participated in investigations involving the use of historical and prospective location information to identify targets, map patterns of travel, corroborate other evidence, and apprehend persons to be arrested. On numerous occasions, this electronic evidence has provided proof of the crimes being investigated and corroborated information already known or suspected by law enforcement. During my investigations, I have regularly used electronic evidence relating to the commission of criminal offenses, including intent, motive, manner, means, and the identity of co-conspirators.

5

9. In addition to my experience in the investigation of individuals involved in federal criminal offenses, I also have knowledge and experience in the apprehension and prosecution of individuals involved in federal criminal offenses. I am familiar with and have experience in the use of devices used to commit those offenses as well as the available technology that can be used by law enforcement to assist in identifying the users of those devices and their locations.

10. This affidavit is intended to show only that there is sufficient probable cause for the requested warrant and does not set forth all of my knowledge about this matter.

**IDENTIFICATION OF THE DEVICE TO BE EXAMINED**

11. The property to be searched are the following electronic devices ("TARGET DEVICES"):

   a. An Apple iPhone 6s in a black-and-silver case, Model # N71mAP with IMEI 355686073553064 ("TARGET DEVICE A"), inventoried as Racine Police Department, Incident Report Number 24-021599, Item 28, and the copy of the previously extracted electronically stored data from TARGET DEVICE A extracted on or about June 4, 2024.

   b. A gray touchscreen "Wiko" brand cell phone, Model #U616AT with IMEI 860325064718265 ("TARGET DEVICE B"), inventoried as Racine Police Department, Incident Report Number 24-021599, Item 29, and the copy of the previously extracted electronically stored data from TARGET DEVICE B extracted on or about June 3, 2024.

12. The TARGET DEVICES, and copies of the previously extracted electronically stored data from the TARGET DEVICES, are currently in the possession of the City of Racine Police Department, 730 Center Street, Racine, Wisconsin 53403.

6

13.     The applied-for warrant would authorize the forensic examination of the TARGET DEVICES for the purpose of identifying electronically stored data, and for the review of the previously extracted electronically stored information from the TARGET DEVICES, particularly described in Attachment B.

## PROBABLE CAUSE

### May 19, 2024 – Shooting at Marci's Bar at 236 Main Street, Racine, Wisconsin

14.     On May 19, 2024 at about 2:33 a.m., a person reported a gunshot outside of Marci's Bar located at 236 Main Street, Racine, Wisconsin, and a black truck leaving the area northbound. The next day, I was contacted by a confidential informant,[1] who said that "Big Cheese," a nickname for SHELBY MORRIS, JR. was involved in a shooting "last night" by Marci's Bar, and that he was shooting at "Iceberg," known as Samuel Driver, and "White Boy Scott," known as Scott Williams.

15.     The day after the shooting, I reviewed the surveillance video from Marci's Bar. Surveillance video from Marci's Bar shows a black male extend his arm and fire at least one

---

[1] The confidential informant was one of the intended victims of the shooting. I know that the confidential informant is reliable, in that the confidential informant has previously provided information to investigators at the Racine Police Department that have led to at least 10 felony arrests and additional information that has proved reliable by other law enforcement officers. I know that the confidential informant has worked as a source for the City of Racine Police Department. I have discussed the reliability of the confidential informant with the handling agents and other officers from this department. Through these discussions and personally, I have learned of no instances where the information provided by the confidential informant to law enforcement agents and officers has been false or misleading. The confidential informant has a criminal history that includes arrests for theft, bail jumping, criminal damage to property, fleeing and eluding an officer, sexual crimes, and drug possession. The confidential informant has received consideration in connection with a drug investigation with the Racine Police Department, where charges were not issued based on the confidential informant's cooperation level and production. The confidential informant has also received small amounts of monetary compensation in return for this information and assistance. For these reasons, I consider the confidential informant to be reliable.

7

round (based on the flash seen from the barrel of a gun) walk near the corner of 3rd Street and Main Street before walking towards a black truck occupied by an unidentified driver and Samuel Driver, who was standing near the passenger side area. Video from the interior of the bar showed Samuel Driver, Scott Williams, Benito Martinez, and Shelby Morris, Jr. both inside and outside the bar. Based on my prior experience with SHELBY MORRIS, I was personally able to identify SHELBY MORRIS in the surveillance video.

16. Right about 2:30 a.m., surveillance video shows SHELBY MORRIS and Samuel Driver exit. A black pickup truck pulled up, and Driver started to walk towards the pickup truck, as SHELBY MORRIS and Martinez walked south on Main Street. As they neared the corner, SHELBY MORRIS turned back and extended his arm out–consistent with shooting a firearm– and a flash is seen from the barrel of a handgun.

17. I also reviewed publicly available Facebook information for SHELBY MORRIS and observed a reel where SHELBY MORRIS was wearing the same camouflage t-shirt and a similar necklace as he was on the day of the shooting.

**May 30, 2024 – Warrant at 1312 Hamilton Street, Upper Unit, Racine, Wisconsin**

18. On May 29, 2024, Investigator Kevin Klinkhammer obtained a warrant issued by Circuit Court Judge Wynne Laufenberg of Racine County to search Morris's residence at 1312 Hamilton Street, Upper, Racine, Wisconsin, along with Morris's person and MORRIS's 2008 Ford Crown Victoria (WI: ATI-1496). Certified rental records show that Shelby Morris with phone number 262-452-9843 was the renter for 1312 Hamilton Street, Upper, Racine, Wisconsin 53404 from April 1, 2023 to June 3, 2024. Through physical surveillance and a review of city-owned cameras in the area of 1312 Hamilton Street, I observed MORRIS's 2008 Ford Crown Victoria coming and going from the house numerous times per day.

8

19. On May 30, 2024 at about 1:04 p.m., the Racine Police Department executed a warrant at 1312 Hamilton Street, Upper Unit, Racine, Wisconsin, after I observed SHELBY MORRIS leave the residence in his 2008 Ford Crown Victoria (WI: ATI-1496). Officers stopped Morris in the vehicle, and obtained the keys to open his apartment. When Morris was taken into custody in his 2008 Ford Crown Victoria (WI: ATI-1496), SHELBY MORRIS had TARGET DEVICE A and TARGET DEVICE B in his possession, and the TARGET DEVICES were seized.

20. Inside the apartment, investigators found the following:

   a. crystal methamphetamine in two clear plastic bags, which tested positive[2] for methamphetamine hydrochloride with a net weight of 260.9 grams with 99% purity, amounting to 258.2 grams of pure methamphetamine;

   b. heroin in two large clear plastic bags, which tested positive for 277.4 grams of a mixture of fentanyl, heroin, p-fluorofentanyl, xylazine, and other additives, and another 17.7 grams that tested positive for fentanyl;

   c. cocaine in 3 individual pre-packaged bags in a larger ziplock bag, which tested positive 36.12 grams of cocaine base, 191 grams of cocaine base, and .64 grams of cocaine hydrochloride;

   d. 110 pills that tested positive for fentanyl with a net weight of 11.9 grams;

   e. 49 miscellaneous pills, including 30 pills that tested positive for alprazolam and 17 tablets that contained morphine;

   f. 12 pills that tested positive for clonazepam;

---

[2] All references to testing positive refers to controlled substance analysis performed by the Drug Enforcement Administration's North Central Laboratory.

9

g. 1,519 grams of suspected marijuana in a white plastic garbage bag;

h. 1.1 grams of suspected psilocybin mushrooms; and

i. 29 suspected vape cartridges in a canvas bag.

21. Inside of SHELBY MORRIS's residence, investigators also found a Taurus G2c 9mm semi-automatic pistol loaded with 13 rounds (Serial: AEE374944), inside the pocket of a black jacket, a Ruger LCP .380 semi-auto pistol (Serial: 372068552) inside of a closet, $400 in U.S. currency, ammunition, magazines with ammunition, two digital scales, multiple empty Ziploc bags, and documents addressed to SHELBY MORRIS at that address.

22. Investigators also found the camouflage t-shirt, multi-colored necklace, and red-and-white shoes visible in the surveillance video from Marci's Bar.

23. The Taurus G2c PT111 9mm pistol bearings serial number AEE374944 was manufactured in Brazil and therefore traveled in interstate commerce. The Ruger model LCP .380 cal. Pistol bearing serial number 372068552 was manufactured in Mayodan, North Carolina and therefore traveled in interstate commerce.

24. After advising him of his rights, I interviewed SHELBY MORRIS in Interview Room 1 of the Racine Police Department's Detective Bureau on or about May 30, 2024. In substance, MORRIS stated the following: M interview, Morris admitted his involvement in the shooting incident, admitting that the smaller gun (.380) that we recovered during the search was the one he used during the shooting, and he stated he was "holding the 9mm" for someone else, but refused to name that person. Morris told me that approximately one pound and another two or three ounces of marijuana belonged to him, but that the other drugs that were located were not his. He also confirmed that the Ruger LCP .380 semi-automatic pistol is the one that he had used the night of the shooting, and said that he had purchased the firearm for $150 from 13- or 14-

10

year-old kid, and MORRIS figured it was better for him to have it then the kid. MORRIS said that he was simply holding the 9mm firearm for somebody, but would not say who. MORRIS denied that the drugs belonged to him, but claimed that he had 2 or 3 ounces of weed in his closet. MORRIS said he thought both guns were in his coat in the closet. MORRIS said that he does not sell drugs, and that the gun was protection because of "P stuff," referring to gang issues.

25. MORRIS provided the unlock code for his Apple iPhone—TARGET DEVICE A—and the Wiko phone—TARGET DEVICE B—was unlocked already. Electronically stored information was previously forensically extracted from the TARGET DEVICES pursuant to the search warrant for 1312 Hamilton Street, Upper Unit, Racine, Wisconsin, on or about June 3, 2024 and June 4, 2024.

26. While detained during the traffic stop, MORRIS claimed that he lived at 916 Albert Street with his aunt, and that his brother Andreas Simpson lives at 1312 Hamilton Street along with him. MORRIS confirmed that he had the key to the upper unit.

27. Based on my training and experience, I believe the weights of the controlled substances recovered from 1312 Hamilton Street Upper are consistent with being possessed with the intent to distribute and not for personal use. This belief is based, in part, upon the weights and packaging of these drugs, the scales and packaging materials, the presence of the loaded firearms, and my overall investigation and experience in drug related investigations.

28. I am familiar with Apple iPhones and other cellular phones in general as I have participated in dozens of drug investigations wherein iPhones and other cellular telephones were seized and later searched by law enforcement. From this, I am aware that iPhones and other cellular phones are capable of storing a large amount of data and that it is common to find relevant data that is held on the device for multiple years.

11

29. SHELBY MORRIS had previously been convicted of conspiracy to possess with the intent to distribute and to distribute 50 grams or more of cocaine base and 5 kilograms or more of cocaine, in violation of 21 U.S.C. §§ 846, 841(a)(1), and 841(b)(1)(A), in *United States v. Shelby Morris*, Case No. 09-CR-248 in the United States District Court of the Eastern District of Wisconsin, for which he served more than 12 months in prison.

30. On February 18, 2026, a Grand Jury in the Eastern District of Wisconsin returned an indictment charging SHELBY MORRIS with violations of 21 U.S.C. §§ 841(a)(1), 841(b)(1)(A), 841(b)(1)(B), 841(b)(1)(C), 841(b)(2), and 851, and 18 U.S.C. §§ 924(c)(1)(A)(i), 922(g)(1), and 924(a)(8).

31. The TARGET DEVICES, and the copies of the previously extracted electronically stored data of the TARGET DEVICES, are currently in the lawful possession of the Racine Police Department. The Racine Police Department seized the TARGET DEVICES during a traffic stop of SHELBY MORRIS, as officers were executing search and seizure warrant issued by the Racine County Circuit Court authorizing the search of (a) SHELBY MORRIS's residence at 1312 Hamilton Street, Upper, Racine, Wisconsin; (b) the person of SHELBY MORRIS; and (c) SHELBY MORRIS's 2008 Ford Crown Victoria (WI: ATI-1496). Therefore, while the United States, including the Federal Bureau of Investigation, and the Racine Police Department might already have all necessary authority to examine the TARGET DEVICES, I seek this additional warrant out of an abundance of caution to be certain that an examination of the TARGET DEVICES will comply with the Fourth Amendment and other applicable laws.

32. The TARGET DEVICES, and copies of the previously extracted electronically stored data from the TARGET DEVICES, are currently in possession of the City of Racine

12

Police Department, 730 Center Street, Racine, Wisconsin 53403. In my training and experience, I know that the TARGET DEVICES have been stored in a manner in which its contents are, to the extent material to this investigation, in substantially the same state as they were when the TARGET DEVICES first came into the possession of the Racine Police Department.

33. I am seeking authorization to search the TARGET DEVICES, and the copies of the previously extracted electronic information from the TARGET DEVICESS, for evidence relating to violations of 21 U.S.C. §§ 841(a)(1) and 843(b), and 18 U.S.C. §§ 922(g)(1), 924(a)(8), and 924(c)(1)(A)(i), and involve Shelby Morris since January 1, 2024. I believe this timeframe is necessary to (1) establish whether Morris is the exclusive user of the specific TARGET DEVICES; (2) identify the potential relationship with the other person(s) that Morris has mentioned as who he was holding the firearm for as well as who he claims the drugs belong to; (3) to determine when Morris acquired the firearm recovered during the search warrant; and (4) to determine the potential sources of supply and customers for the multiple different types of controlled substances found in SHELBY MORRIS's residence. I know, based on my training and experience, that firearms are of an enduring value to a drug trafficker, particularly those like SHELBY MORRIS who is a convicted felon and unable to lawfully purchase firearms in a store. Therefore, I know that it is common for drug traffickers to acquire a firearm and retain possession of that firearm for years. Therefore, I believe that evidence as to the source of this firearm will be found during the timeframe requested.

<u>**TECHNICAL TERMS**</u>

34. Based on my training and experience, I use the following technical terms to convey the following meanings:

13

a. Wireless telephone: A wireless telephone (or mobile telephone, or cellular telephone) is a handheld wireless device used for voice and data communication through radio signals. These telephones send signals through networks of transmitter/receivers, enabling communication with other wireless telephones or traditional "land line" telephones. A wireless telephone usually contains a "call log," which records the telephone number, date, and time of calls made to and from the phone. In addition to enabling voice communications, wireless telephones offer a broad range of capabilities. These capabilities include: storing names and phone numbers in electronic "address books;" sending, receiving, and storing text messages and e-mail; taking, sending, receiving, and storing still photographs and moving video; storing and playing back audio files; storing dates, appointments, and other information on personal calendars; and accessing and downloading information from the Internet. Wireless telephones may also include global positioning system ("GPS") technology for determining the location of the device.

b. Digital camera: A digital camera is a camera that records pictures as digital picture files, rather than by using photographic film. Digital cameras use a variety of fixed and removable storage media to store their recorded images. Images can usually be retrieved by connecting the camera to a computer or by connecting the removable storage medium to a separate reader. Removable storage media include various types of flash memory cards or miniature hard drives. Most digital cameras also include a screen for viewing the stored images. This storage media can contain any digital data, including data unrelated to photographs or videos.

c. Portable media player: A portable media player (or "MP3 Player" or iPod) is a handheld digital storage device designed primarily to store and play audio, video, or photographic files. However, a portable media player can also store other digital data. Some portable media players can use removable storage media. Removable storage media include various types of flash memory cards or miniature hard drives. This removable storage media can also store any digital data. Depending on the model, a portable media player may have the ability to store very large amounts of electronic data and may offer additional features such as a calendar, contact list, clock, or games.

d. GPS: A GPS navigation device uses the Global Positioning System to display its current location. It often contains records the locations where it has been. Some GPS navigation devices can give a user driving or walking directions to another location. These devices can contain records of the addresses or locations involved in such navigation. The Global Positioning System (generally abbreviated "GPS") consists of 24 NAVSTAR satellites orbiting the Earth. Each satellite contains an extremely accurate clock. Each satellite repeatedly transmits by radio a mathematical representation of the current time, combined with a special sequence of numbers. These signals are sent by radio, using specifications that are publicly available. A GPS antenna on Earth can receive those signals. When

14

a GPS antenna receives signals from at least four satellites, a computer connected to that antenna can mathematically calculate the antenna's latitude, longitude, and sometimes altitude with a high level of precision.

e. PDA: A personal digital assistant, or PDA, is a handheld electronic device used for storing data (such as names, addresses, appointments or notes) and utilizing computer programs. Some PDAs also function as wireless communication devices and are used to access the Internet and send and receive e-mail. PDAs usually include a memory card or other removable storage media for storing data and a keyboard and/or touch screen for entering data. Removable storage media include various types of flash memory cards or miniature hard drives. This removable storage media can store any digital data. Most PDAs run computer software, giving them many of the same capabilities as personal computers. For example, PDA users can work with word-processing documents, spreadsheets, and presentations. PDAs may also include global positioning system ("GPS") technology for determining the location of the device.

f. Tablet: A tablet is a mobile computer, typically larger than a phone yet smaller than a notebook, that is primarily operated by touching the screen. Tablets function as wireless communication devices and can be used to access the Internet through cellular networks, 802.11 "wi-fi" networks, or otherwise. Tablets typically contain programs called apps, which, like programs on a personal computer, perform different functions and save data associated with those functions. Apps can, for example, permit accessing the Web, sending and receiving e-mail, and participating in Internet social networks.

g. Pager: A pager is a handheld wireless electronic device used to contact an individual through an alert, or a numeric or text message sent over a telecommunications network. Some pagers enable the user to send, as well as receive, text messages.

h. IP Address: An Internet Protocol address (or simply "IP address") is a unique numeric address used by computers on the Internet. An IP address is a series of four numbers, each in the range 0-255, separated by periods (e.g., 121.56.97.178). Every computer attached to the Internet computer must be assigned an IP address so that Internet traffic sent from and directed to that computer may be directed properly from its source to its destination. Most Internet service providers control a range of IP addresses. Some computers have static—that is, long-term—IP addresses, while other computers have dynamic—that is, frequently changed—IP addresses.

i. Internet: The Internet is a global network of computers and other electronic devices that communicate with each other. Due to the structure of the Internet, connections between devices on the Internet often cross state and international borders, even when the devices communicating with each other are in the same state.

15

35.     Based on my training and experience, I know that the TARGET DEVICES have capabilities that allow them to serve as a wireless telephone, digital camera, portable media player, GPS navigation device, and PDA.  In my training and experience, examining data stored on devices of this type can uncover, among other things, evidence that reveals or suggests who possessed or used the device.

**ELECTRONIC STORAGE AND FORENSIC ANALYSIS**

36.     Based on my knowledge, training, and experience, I know that electronic devices can store information for long periods of time. Similarly, things that have been viewed via the Internet are typically stored for some period of time on the device.  This information can sometimes be recovered with forensics tools.

37.     There is probable cause to believe that things that were once stored on the TARGET DEVICES may still be stored there, for at least the following reasons:

   a. Based on my knowledge, training, and experience, I know that computer files or remnants of such files can be recovered months or even years after they have been downloaded onto a storage medium, deleted, or viewed via the Internet. Electronic files downloaded to a storage medium can be stored for years at little or no cost.  Even when files have been deleted, they can be recovered months or years later using forensic tools.  This is so because when a person "deletes" a file on a computer, the data contained in the file does not actually disappear; rather, that data remains on the storage medium until it is overwritten by new data.

   b. Therefore, deleted files, or remnants of deleted files, may reside in free space or slack space—that is, in space on the storage medium that is not currently being used by an active file—for long periods of time before they are overwritten.  In addition, a computer's operating system may also keep a record of deleted data in a "swap" or "recovery" file.

   c. Wholly apart from user-generated files, computer storage media—in particular, computers' internal hard drives—contain electronic evidence of how a computer has been used, what it has been used for, and who has used it.  To give a few examples, this forensic evidence can take the form of operating system configurations, artifacts from operating system or application operation, file system data structures, and virtual memory "swap" or paging files.  Computer users typically do not erase or delete this evidence, because special software is

16

typically required for that task. However, it is technically possible to delete this information.

    d. Similarly, files that have been viewed via the Internet are sometimes automatically downloaded into a temporary Internet directory or "cache."

38. *Forensic evidence.* As further described in Attachment B, this application seeks permission to locate not only electronically stored information that might serve as direct evidence of the crimes described on the warrant, but also forensic evidence that establishes how the TARGET DEVICES were used, the purpose of its use, who used it, and when. There is probable cause to believe that this forensic electronic evidence might be on the TARGET DEVICES because:

    a. Data on the storage medium can provide evidence of a file that was once on the storage medium but has since been deleted or edited, or of a deleted portion of a file (such as a paragraph that has been deleted from a word processing file).

    b. Forensic evidence on a device can also indicate who has used or controlled the device. This "user attribution" evidence is analogous to the search for "indicia of occupancy" while executing a search warrant at a residence.

    c. A person with appropriate familiarity with how an electronic device works may, after examining this forensic evidence in its proper context, be able to draw conclusions about how electronic devices were used, the purpose of their use, who used them, and when.

    d. The process of identifying the exact electronically stored information on a storage medium that is necessary to draw an accurate conclusion is a dynamic process. Electronic evidence is not always data that can be merely reviewed by a review team and passed along to investigators. Whether data stored on a computer is evidence may depend on other information stored on the computer and the application of knowledge about how a computer behaves. Therefore, contextual information necessary to understand other evidence also falls within the scope of the warrant.

    e. Further, in finding evidence of how a device was used, the purpose of its use, who used it, and when, sometimes it is necessary to establish that a particular thing is not present on a storage medium.

    f. I know that when an individual uses an electronic device to source, supply, obtain, distribute, and traffick drugs, the individual's electronic device will

17

generally serve both as an instrumentality for committing the crime, and also as a storage medium for evidence of the crime. The electronic device is an instrumentality of the crime because it is used as a means of committing the criminal offense. The electronic device is also likely to be a storage medium for evidence of crime. From my training and experience, I believe that an electronic device used to commit a crime of this type may contain: data that is evidence of how the electronic device was used; data that was sent or received; and other records that indicate the nature of the offense.

39. *Nature of examination.* Based on the foregoing, and consistent with Rule 41(e)(2)(B), the warrant I am applying for would permit the examination of the device consistent with the warrant. The examination may require authorities to employ techniques, including but not limited to computer-assisted scans of the entire medium, that might expose many parts of the device to human inspection in order to determine whether it is evidence described by the warrant.

40. *Manner of execution.* Because this warrant seeks only permission to examine a device already in law enforcement's possession, the execution of this warrant does not involve the physical intrusion onto a premises. Consequently, I submit there is reasonable cause for the Court to authorize execution of the warrant at any time in the day or night.

## <u>CONCLUSION</u>

41. I submit that this affidavit supports probable cause for a search warrant authorizing the examination of the TARGET DEVICES described in Attachment A to seek the items described in Attachment B.

18

## ATTACHMENT A

The property to be searched are the following electronic devices ("TARGET DEVICES"):

    a.  An Apple iPhone 6s in a black-and-silver case, Model # N71mAP with IMEI 355686073553064 ("TARGET DEVICE A"), inventoried as Racine Police Department, Incident Report Number 24-021599, Item 28, and the copy of the previously extracted electronically stored data from TARGET DEVICE A extracted on or about June 4, 2024.

    b.  A gray touchscreen "Wiko" brand cell phone, Model #U616AT with IMEI 860325064718265 ("TARGET DEVICE B"), inventoried as Racine Police Department, Incident Report Number 24-021599, Item 29, and the copy of the previously extracted electronically stored data from TARGET DEVICE B extracted on or about June 3, 2024.

The TARGET DEVICES, and copies of the previously extracted electronically stored data from the TARGET DEVICES, are currently in possession of the City of Racine Police Department, 730 Center Street, Racine, Wisconsin 53403.

This warrant authorizes the forensic examination of the TARGET DEVICES for the purpose of identifying the electronically stored information, and for the review of the previously extracted electronically stored information from the TARGET DEVICES, particularly described in Attachment B.

**ATTACHMENT B**

1.      All records on the TARGET DEVICES described in Attachment A that relate to violations of 21 U.S.C. §§ 841(a)(1) and 843(b), and 18 U.S.C. §§ 922(g)(1), 924(a)(8), and 924(c)(1)(A), and involve Shelby Morris between on or about January 1, 2024 and May 30, 2024, including:

     a.  Information about controlled substances, including tablets, powder, and vape cartridges;

     b.  Information about paraphernalia associated with the manufacture and distribution of controlled substances, including scales, measuring devices, weighing devices, packaging materials, and containers, bags, or boxes to hold or transport controlled substances;

     c.  Information about the proceeds of drug trafficking activities, such as currency, crypto currency (in any format, including but not limited to wallets (digital and paper), public keys (addresses), private keys, and recovery seeds), precious metals, financial instruments, jewelry, and documents and deeds reflecting the purchase or lease of real estate, vehicles, precious metals, jewelry, or other items obtained with the proceeds of drug trafficking activities;

     d.  Bank account records, loan documents, wire transfer records, money order receipts, postal express mail envelopes, bank statements, safe deposit box keys and records, money containers, financial records and notes showing payment, receipt, concealment, transfer, or movement of money generated from the sale of controlled substances, or financial transactions related to the trafficking of controlled substances;

     e.  Drug or money ledgers, drug distribution or customer lists, drug supplier lists, correspondence, notations, logs, receipts, journals, books, records, and other documents noting the price, quantity, or times when controlled substances were obtained, transferred, sold, distributed, or concealed;

     f.  lists of customers and related identifying information;

     g.  types, amounts, and prices of drugs trafficked as well as dates, places, and amounts of specific transactions;

     h.  Personal telephone books, address books, telephone bills, photographs, letters, cables, telegrams, facsimiles, personal notes, documents and other items or lists reflecting names, addresses, telephone numbers, addresses and communications regarding illegal activities among and between members and associates involved in drug trafficking activities;

i.   Records of off-site storage locations, including but not limited to safe deposit box keys and records, and records and receipts and rental agreements for storage facilities;

j.   Records and information related to travel for purposes of drug trafficking, such as passports, airline tickets, bus tickets, vehicle rental receipts, credit card receipts, taxi cab receipts, hotel and restaurant receipts, canceled checks, maps, and records of long distance calls reflecting travel;

k.   Records relating to the possession, receipt, or transfer of any firearms and/or ammunition, including a Ruger firearm and a Taurus firearm;

l.   Information about possession in furtherance of a drug trafficking crime or crime of violence, and information during and in relation to a drug trafficking crime and carrying and using in relation to, or brandishing or discharge of a firearm;

m.   any information related to sources of drugs (including names, addresses, phone numbers, or any other identifying information);

n.   any information recording SHELBY MORRIS's schedule or travel from January 1, 2024 to May 30, 2024;

o.   Indicia of occupancy, residency, or ownership of the premises and things described in the warrant, including utility bills, telephone bills, loan payment receipts, rent receipts, trust deeds, lease or rental agreements, addressed envelopes, escrow documents, and keys;

p.   all bank records, checks, credit card bills, account information, and other financial records;

q.   Photographs, videotapes, or other records of assets, co-conspirators, or controlled substances;

r.   Records and information relating to a conspiracy to distribute, manufacture, dispense, or possess with the intent to manufacture, distribute, or dispense a controlled substance;

s.   Records and information relating to the distribution, manufacture, dispensing, or possession with the intent to manufacture, distribute, or dispense a controlled substance;

t.   Records and information about customers, including lists of customers and related identifying information;

u.   Records and information relating to the types, amounts, and prices of drugs imported, trafficked, and distributed as well as dates, places, and amounts of specific transactions;

2

v. Records and information relating to sources of drugs (including names, addresses, phone numbers, or any other identifying information);

w. evidence of who used, owned, or controlled the TARGET DEVICES at the time the things described in this warrant were created, edited, or deleted, such as logs, registry entries, configuration files, saved usernames and passwords, documents, browsing history, user profiles, email, email contacts, "chat," instant messaging logs, photographs, and correspondence;

x. evidence of software that would allow others to control the TARGET DEVICES, such as viruses, Trojan horses, and other forms of malicious software, as well as evidence of the presence or absence of security software designed to detect malicious software;

y. evidence of the lack of such malicious software;

z. evidence indicating how and when the computer was accessed or used to determine the chronological context of computer access, use, and events relating to crime under investigation and to the computer user;

aa. evidence indicating the computer user's state of mind as it relates to the crime under investigation;

bb. evidence of the attachment to the TARGET DEVICES of other storage devices or similar containers for electronic evidence;

cc. evidence of counter-forensic programs (and associated data) that are designed to eliminate data from the TARGET DEVICES;

dd. evidence of the times the TARGET DEVICES was used;

ee. passwords, encryption keys, and other access devices that may be necessary to access the TARGET DEVICES;

ff. documentation and manuals that may be necessary to access the TARGET DEVICES or to conduct a forensic examination of the TARGET DEVICES;

gg. records of or information about Internet Protocol addresses used by the TARGET DEVICES;

hh. records of or information about the TARGET DEVICES's Internet activity, including firewall logs, caches, browser history and cookies, "bookmarked" or "favorite" web pages, search terms that the user entered into any Internet search engine, and records of user-typed web addresses; and

ii. contextual information necessary to understand the evidence described in this attachment.

3

2. Evidence of user attribution showing who used or owned the TARGET DEVICES at the time the things described in this warrant were created, edited, or deleted, such as logs, phonebooks, saved usernames and passwords, documents, and browsing history.

As used above, the terms "records" and "information" include all of the foregoing items of evidence in whatever form and by whatever means they may have been created or stored, including any form of computer or electronic storage (such as flash memory or other media that can store data) and any photographic form.

This warrant authorizes a review of electronic storage media and electronically stored information seized or copied pursuant to this warrant in order to locate evidence, fruits, and instrumentalities described in this warrant. The review of this electronic data may be conducted by any government personnel assisting in the investigation, who may include, in addition to law enforcement officers and agents, attorneys for the government, attorney support staff, and technical experts. Pursuant to this warrant, the FBI may deliver a complete copy of the seized or copied electronic data to the custody and control of attorneys for the government and their support staff for their independent review.

4